**PRINCE LINE, Limited, v. AMERICAN PAPER EXPORTS, Inc.**
**No. 165.**

Circuit Court of Appeals, Second Circuit.
Feb. 8, 1932.

McManus, Ernst, Ernst & Lynch, of New York City (Irving L. Ernst and Hugo I. Epstein, both of New York City, of counsel), for appellant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Charles T. Cowenhoven, Jr., and Richard L. Sullivan, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The Prince Line, the libellant, is a common carrier, engaged in foreign trade between New York and the Far East. Between March, 1926, and March, 1927, it carried a number of parcels of paper for the American Paper Exports, Inc., the respondent, upon which that company paid the freights as charged. This suit is to recover for additional amounts alleged to be due for the following reasons: The line was one of a number of carriers which had entered into an "agreement" (the "Far East Conference"), by which fixed rates were established for the carriage of goods from the United States to Asiatic ports. This was filed with the Shipping Board, which approved it under the powers vested in it by section 814 of title 46 of the United States Code (46 USCA §

814); it thus became a tariff for the regulation of freights, for some purposes having the force of law. From the outset the company shipped all its paper under bills of lading which described it only as "paper," and the dock receipts read the same way. The tariff contained twelve specified classes of paper and a final class, "Not Otherwise Specified," each with its appropriate rate, though not all different. The company prepared the bills of lading, leaving the rates blank; the line entered them at its own office and then sent back a counterfoil. The parties differ as to how the rates were ascertained, and the judge did not decide the issue. The line says that when the company brought in the bills, they told it what the shipments contained, and that, relying on this information, it then entered the appropriate rates as fixed by the tariff. The company says that both parties always understood that the paper should be accepted at one of two agreed rates, the choice being left to the company's pleasure. The issue of fact is therefore whether the parties had agreed upon the rates, regardless of contents, or whether they had agreed upon the established rates to be allocated by contents, the company declaring what that was. As will appear, the dispute is irrelevant to the disposition of the suit, though not to the theory on which part of the recovery must rest.

Whatever the original arrangement, in October, or at the latest November, complaints from the company's competitors in the Orient reached the line that unclassified paper was being shipped at cut freights, and the parties had an interview. The company then at any rate took the position that if the line wished to hold their business, it must be content to accept unclassified paper at rates to be fixed by them and without information as to its class, which they would under no circumstances disclose. This the line accepted; at least it continued to receive the paper marked as before, and to charge such rates as the company dictated. The line filed this suit on the theory that the contract was to carry at the established rates, but that, if it contemplated cutting rates, it was invalid, and the established rates could be recovered. The judge took the second view and entered an interlocutory decree.

■■■ At least after December, 1926, the company had definitely declared their position, and the line was violating the Shipping Act (section 815 (second), title 46, U. S. Code [46 USCA § 815, subd. 2]), which for-

bade a carrier in foreign trade to "allow any person to obtain transportation for property at less than the regular rates then established and enforced on the line of such carrier, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means." The billing was indeed not false; probably the classification was, because the selection of the rate presupposed a classification of the merchandise, and to select rates which both sides knew to have no relation to the contents, was to classify the goods falsely. However, we need not here go that far. It is conceded that the billing was to conceal the contents from the company's competitors, and it thus facilitated the preference which had been conceded. This was an "unfair device or means," for it destroyed that equality of treatment between shippers, which it was the primary purpose of the section, and for that matter of the whole statute, to maintain. The company answer that this is exactly what the section does not do, and they are right to this extent, that unless the carrier is complaisant to some unfair means used to obtain the lower rate, it has not violated the section. The law did not forbid all concessions to a shipper; apparently it assumed that if these were above board, and known or ascertainable by competitors, the resulting jealousies and pressure upon the carrier would be corrective enough. But it did forbid the carrier to grant such favors, when accompanied by any concealment, and its command in that event was as absolute as though it had been unconditional. It was among the evils aimed at, when the company with the line's acquiescence refused to allow the goods to be classified and insisted upon the right to choose the rates.

■■■ Whether the line can take advantage of its own violation of the statute by recovering the amount of the preference is another matter. Prima facie it may not; volenti non fit injuria. But the situation is similar to that arising under the Interstate Commerce Act (section 6 (7), title 49 U. S. Code, 49 USCA § 6 (7), where the courts have found warrant for raising civil liabilities against the shipper by which the desired equality will be secured, refusing to leave the remedy to criminal prosecution alone. Thus, not only may the carrier withhold the goods for the difference in rates, regardless of any agreement to ship for less than those established (Gulf, etc., Ry. v. Hefley, 158 U. S. 98, 15 S. Ct. 802, 39 L. Ed. 910; Texas

& Pacific Ry. v. Mugg, 202 U. S. 242, 26 S. Ct. 628, 50 L. Ed. 1011); but it may also recover the difference from the shipper or consignee, as the case may be, after it has delivered the goods (Louisville & Nashville Ry. v. Maxwell, 237 U. S. 94, 35 S. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665; Pittsburgh, etc., Ry. v. Fink, 250 U. S. 577, 40 S. Ct. 27, 63 L. Ed. 1151; Louisville & Nashville Ry. v. Central Iron & Coal Co., 265 U. S. 59, 44 S. Ct. 441, 68 L. Ed. 900).

It is true that in these cases the carrier's agent made the undercharge in ignorance of the proper rate, but the carrier knew it, and, could not excuse itself because of the ignorance of its agent. Besides, it was expressly held that the shipper also was charged with knowledge of the published rates. We think that a shipper in foreign trade is equally charged, and that he becomes liable for the rates as filed and approved if he obtains cheaper transportation by any means unfair to his competitors. The statute overrides all such contracts, and imposes a liability upon him which the carrier may, and indeed, must enforce. Within its own ambit, the same remedies attend a violation of the Shipping Act, as have been accorded under the Interstate Commerce Act.

▮▮ Nor do we think that the line was bound to take preliminary recourse to the Shipping Board itself. It had none. The nearest section is section 821, 46 USCA, but it does not apply. It authorizes any one to file a complaint against a carrier, or "other person subject to this chapter * * * asking reparation for the injury * * * caused" by a violation of the act. It is doubtful if a shipper is "subject to" the act at all—at least we can find no express command to him—but if he is, it is clear that the carrier is not here suing for reparation because of any injury caused by a shipper. The company did not injure the line by shipping under a contract to which it had agreed, and which it may indeed have actually sought.

Thus, so far as the suit depends upon shipments made after December 31, 1926, the statute raised a cause of action in spite of the contract. As to the earlier shipments, the case is no different if we accept the company's story. Both parties understood from the outset that the company was to be free to charge such rates as they pleased, billing the paper so that it could not be properly classified. If on the other hand we take the line's version, it was accepting the shipments up to January 1, 1927, upon an implied agreement to carry at reasonable rates, which in

the circumstances were the established rates. It supposed that it was doing this, relying upon the company correctly to declare the goods; and its suit, on this hypothesis, is on a maritime contract. It need use the company's deceit as to the contents only as evidence to explain why it apparently fixed other than the established rates for its services. The deceit is not an element in its cause of suit, but means to overcome any inferences as to the terms of the contract which might otherwise be drawn. Hence we are not troubled by the line's repeated concessions at the trial that it did not rely upon the misrepresentations. Thus, as to the earlier shipments, the basis of the recovery will be different, according as the contract was of one sort or the other, but the result is the same, and the line recovers. Therefore the judge was right on any showing, and the interlocutory decree for all the shipments must be affirmed.

▮▮ Although it was not argued at the bar, the question of the jurisdiction of the District Court is necessarily before us. The suit was laid in the admiralty, but in so far as it depended upon a cause of action arising from the libellant's violation of the Shipping Act, it is at least doubtful whether it was cognizable in that side of the court. However, the libel alleges, and the answer admits, that the libellant is a foreign corporation and the respondent a corporation of New York; and the claim is for more than three thousand dollars. Thus every fact appears, necessary to the jurisdiction of the court on the law side under the diversity clause, section 41 (1) (c), title 28, U. S. Code, 28 USCA § 41 (1) (c). When a cause of action is within the substantive jurisdiction of the District Court for any reason, it does not mar that jurisdiction that the suitor proceeds as libellant in the admiralty rather than as plaintiff at law. U. S. ex rel. Pressprich v. Elwell & Co., 250 F. 939 (C. C. A. 2); Owens v. Breitung, 270 F. 190, 193, (C. C. A. 2); Cory Bros. v. U. S., 51 F.(2d) 1010, (C. C. A. 2). The warrant for this doctrine was discussed in U. S. ex rel. Pressprich v. Elwell & Co.

▮▮ The only question open is whether the respondent has lost any substantial rights by being brought into the admiralty side. The differences are all formal except the right to a trial by jury, and that can be relinquished. Thus, in U. S. ex rel. Pressprich v. Elwell & Co., the respondent had admitted jurisdiction in the admiralty by his answer. In the case at bar the libel alleged

such jurisdiction (article eighth), but the answer traversed it, (article sixth). This may have laid the foundation for a demand that the cause should be transferred to the law side, which arguendo we may assume should have been granted. It was never followed up. At no time has the respondent so much as intimated that it is entitled to try the issues to a jury; neither during the actual trial, in the assignments of error, in the brief, nor at the argument. The formal denial of the jurisdiction of the admiralty side was not enough to preserve the right. To be sure, it did not definitely appear at the outset on just what the libellant was relying; it is fair to construe the libel as possibly sounding in contract alone. But it became abundantly plain as the cause proceeded that the pleading spoke with two voices, and meant to rely upon the Shipping Act, if a contract to carry at the established rates was not proved. The respondent was bound at that time to claim its right to a jury, if it meant to insist upon it; for a jury trial is not in civil cases a constitutional necessity; a defendant may lose it by inaction. Bank of Columbia v. Okely, 4 Wheat. 235, 4 L. Ed. 559; U. S. v. National City Bank, 281 F. 754, 757 (C. C. A. 2); Maytag v. Meadows Mfg. Co., 45 F.(2d) 299, (C. C. A. 7). It remains irrelevant in point of jurisdiction, as it is on the merits, to decide what the actual contract was. The decree was within the power of the court.

In what we have said we do not pass upon whether the District Court had also another source of jurisdiction on the ground that the libellant's cause of suit arose under a law of the United States. Jud. Code § 24 (1) (a), section 41 (1) (a), title 28, U. S. Code, 28 USCA § 41 (1) (a). One ground was enough; it is beyond dispute.

Decree affirmed.