## AMBLER et al. v. BLOEDEL DONOVAN LUMBER MILLS.

### No. 7115.

Circuit Court of Appeals, Ninth Circuit.

Dec. 6, 1933.

Grosscup & Morrow and John Ambler, all of Seattle, Wash., for appellants.

William Harrison Abbott, of Bellingham, Wash., and Bogle, Bogle & Gates, Lawrence Bogle, and Edward G. Dobrin, all of Seattle, Wash., for appellee.

Before WILBUR and GARRECHT, Circuit Judges, and FEE, District Judge.

GARRECHT, Circuit Judge.

Appellants as the ancillary receivers of Dimon Steamship Corporation instituted this action against appellee, a shipper, to recover freight moneys claimed to be due on four shipments of lumber carried by the company for the shipper during October, November, and December, 1931, from Puget Sound to the Atlantic Coast.

The recovery sought was $38,975.66, with interest, based upon a $10 per M. board feet rate. The District Court allowed recovery of $15,349.68, with interest based upon $8 per M. board feet rate. The appellants here seek to recover the difference denied by the lower court amounting to $23,625.98. The amounts are not in dispute. The applicable freight rate is the sole point in issue.

The Bloedel Donovan Lumber Mills, appellee, owns and operates a mill at Bellingham, Wash., and, in connection with its sales organization, has maintained an office in New York City. During the year 1931, and for many years prior thereto, this company was engaged in the business of manufacturing lumber and lumber products, much of which was sold in the East.

During and prior to the year 1931, the Dimon Steamship Corporation, with its office in New York City, operated vessels in the intercoastal trade, which carried very large lumber cargoes from the Pacific to the Atlantic Coast.

In addition to the Dimon Steamship Corporation, there were a number of other water carriers engaged in transporting lumber and lumber products in the intercoastal trade, during the times herein mentioned.

Market and economic conditions in the fall of 1931 were such as to curtail operations of Pacific Coast lumber mills, resulting in large surplus of cargo space on lumber carrying vessels, beginning before September, and particularly emphasized in October and November, which, notwithstanding the efforts of the carriers during this time to maintain and secure higher rates, resulted in a constant trend toward lower levels.

There were from twelve to twenty major lumber shippers doing business on the Pacific Coast during this period, each of these water carriers dealt with one or more of the shippers, and they worked out arrangements to suit the best interests of the individual shippers. The appellee and the Puget Sound Associated Mills, another large shipper, had similar arrangements with the Dimon Steamship Corporation.

This corporation operated, among other vessels, the steamships Pacific Hemlock, Pacific Pine, Pacific Cedar, and Pacific Oak. These vessels were due to arrive for loading on Puget Sound, the Pacific Hemlock about the middle of October, with the other vessels following in order named at intervals of about fourteen days. The steamship company was making every effort to supply these vessels with return lumber shipments, and, for the purpose of receiving cargoes for its vessels, the officers of the company engaged in negotiations for working out arrangements with the appellee and the Puget Sound Associated Mills.

Protracted negotiations were carried on by the Dimon Steamship Corporation with Mr. Lockridge in charge of the New York City office of appellee and Mr. Clark, its general sales manager, seeking to secure shipments of lumber for these vessels. Appellee had no lumber sold which could be supplied, but an agreement was finally entered into whereby appellee agreed to pay an $8 per 1,000 rate on lumber shipped in transit, that is to say, unsold, and attempt to sell the same while so in transit or to place it in storage on the East Coast until it could be sold.

This agreement was confirmed by the following letter:

"October 13, 1931.
"Dimon Steamship Corp., 24 State Street, New York City.

"Attention Mr. Dimon

"Dear Grayson:

"ss Pacific Hemlock

"Following up our conversation of the 12th, the writer talked with our Bellingham office over the phone on the 12th and they will take care of the Pacific Hemlock for you.

"It is understood that the lumber Bs/L will read $10.00 per M and the shingle Bs/L 50¢ on association weights and that we are to be refunded 20% of the total freight bills on this vessel.

"All lumber that we will deliver to the consignees such as in the past, you are to collect the ocean charges cash.

"All lumber which we put in storage, we are to pay the freight in the following manner.

"All lumber sold out of storage within the first 30 days we are to settled for the freight on that portion.

"All lumber sold within the next thirty days, we are to settle the freight due on that portion.

"Total freight is due and payable to you by us 90 days from final discharge, i. e., final discharge of the lumber out of the vessel.

"Undoubtedly considerable of this lumber will be sold before it reaches New York and inasmuch as you are collecting 25% too much freight money on these direct sales, that 25% is to apply against our payment to you.

"We know that our minds have met on this, Grayson, and we are merely writing you this letter as a memorandum, copy of same being sent to our Bellingham office.

"Very truly yours,
"Bloedel Donovan Lumber Mills
"[Signed] C. R. Lockridge.
"CRL:W
"cc Bellingham"

The Pacific Hemlock arrived at Puget Sound on October 13th and commenced loading at Bellingham on the 16th, sailing from there on October 29th.

The Shipping Act of 1916, as amended (46 USCA § 801 et seq.), is designed to parallel, in its own field, the Interstate Commerce Act (49 USCA § 1 et seq.). United States Navigation Co., Inc., v. Cunard S. S. Co., Ltd., et al., 284 U. S. 474, 52 S. Ct. 247, 76 L. Ed. 408. The first several sections of the Shipping Act contain the mechanics, but the act provides, in substance so far as we are concerned here, that no common carrier by water shall allow a deferred rebate to any shipper; that competitive carriers shall file with the United States Shipping Board a copy of every agreement between themselves fixing transportation charges, which the Board may approve or disapprove, and that such agreements may not be carried out until approved by the Board; that the carrier may commit no discriminatory acts toward shippers or localities; and that carriers shall establish just and reasonable rates, the maximum rates which must be filed with the Board.

An agreement entered into between thirteen intercoastal carriers on October 16, 1931, was filed with the United States Shipping Board on October 19th, and approved by the Board on October 21st. This agreement, which was filed pursuant to section 15 of the Shipping Act of 1916 (46 USCA § 814) and section 15 of the Board's regulations, provided that: " * * * Each of such Carriers shall from this date up to and including October 31, 1931, maintain a $10.00 per one thousand feet net Board measurement rate on lumber from Pacific to Atlantic Coast ports and will not during such period make any quotations or commitments at less that $10.-00 per one thousand feet net board measurement, for vessels commencing to load in the months of October, November and December of this year and January 1932. * * * "

Continued negotiations between the mills and the carrier, with the shipper attempting to beat down the rate, resulted in an agreement respecting cargo for each of the other three vessels, namely, the Pacific Pine, Pacific Cedar, and the Pacific Oak. A confirming letter, dated November 2, 1931, from the eastern representative of the Bloedel Donovan Lumber Mills to the Dimon S. S. Corporation, stated: " * * * All details surrounding these three vessels to be the same as the SS Pacific Hemlock expressed in our letter of October 13th."

These three vessels arrived, began loading, and sailed, as follows:

| | Arrived Puget Sound | Began Loading | Sailed |
| ----- | ------------------- | ------------- | ------- |
| Pine | Oct. 31 | Nov. 6 | Nov. 17 |
| Cedar | Nov. 13 | Nov. 23 | Nov. 28 |
| Oak | Nov. 28 | Dec. 5 | Dec. 12 |

The bills of lading covering shipments on the Hemlock and Pine stated the rate to be $10 per thousand, while the bills of lading for the Cedar and Oak read "as per agreement."

A libel in personam was filed by the ancillary receivers of the Dimon Steamship Corporation, with the Bloedel Donovan Lumber Mills named respondent, setting forth the names of the vessels and the amount of freight alleged to remain unpaid on each, at the rate of $10 per thousand feet. The total amount of freight claimed was $38,975.66.

The answer of respondent admitted the shipments, but denied that the rate was $10 per thousand, alleging the rate to be $8, and admitted unpaid freight in the sum of $13,-346.58, claiming damage to certain freight and overcollection on freight shipped Pacific Pine. Libelants in their reply to the answer admitted an offset in the sum of $1,551.43. Thereafter a stipulation of facts was filed relative to admission in evidence of the bills of lading and confirming letters of the lumber mills to the Dimon Steamship Corporation. It was further stipulated that, if the $10 rate applied, the amount due libelants would be $38,975.66; that, if the $8 rate applied, there would be due $20,129.50, less credit Pacific Pine of $4,779.82, making a total of $15,349.68. In either case the offset of $1,551.42 to be deducted.

After hearing the evidence, Judge Neterer handed down his opinion, 5 F. Supp. 440, which he adopted as his findings of facts and conclusions of law, and thereafter and pursuant thereto decree was entered that libelants recover the sum of $13,798.26, and $172.15

interest. From which decree libelants appeal.

During examination of the first witness, after a statement by counsel for libelants that they contended the contract to be in violation of the Shipping Act of 1916, in that the contract was an attempt, by unfair and unjust means, to allow one shipper to obtain a rate lower than the established rate during this period, the libelants were permitted to amend the libel by the insertion of a paragraph alleging the violation of sections 14 and 16 of the said U. S. Shipping Act (46 USCA §§ 812, 815).

■ At the trial, counsel for libelants offered in evidence letters and telegrams which had passed between the New York office of the steamship corporation and their agents, the Percy S. Laing Shipping Company of Seattle, Wash. These letters and telegrams, or copies thereof in some instances, related either directly or indirectly to the shipments made by the lumber mills. Objection was interposed by respondent's counsel to the offering of this correspondence in evidence. The papers were received and marked, the court reserving its ruling, but later the evidence was excluded.

This ruling is assigned as error. We agree with the trial court that the evidence was not admissible. Insurance Co. of North America v. Guardiola, 129 U. S. 642, 9 S. Ct. 425, 32 L. Ed. 802; Freeborn v. Smith, 2 Wall. (69 U. S.) 160, 176, 17 L. Ed. 922.

■ The evidence is sufficient to show that the agreed rate was $8 per thousand on the lumber shipped. Although on the bills of lading was noted a rate of $10, this was not conclusive, because the bill of lading is not the contract, but at best is only evidence thereof, and any "irreconcilable repugnancy between the prior written contract and the bills of lading * * * would have to be resolved in favor of the former." Toyo Kisen Kaisha v. W. R. Grace & Company, 53 F. (2d) 740, 742 (C. C. A. 9); Mobile & M. Railway Company v. Jurey et al., 111 U. S. 584, 591, 4 S. Ct. 566, 28 L. Ed. 527. Porter and McNair's Scrutton on Charter Parties and Bills of Lading (12th Edition) p. 9, says: "A bill of lading is a receipt for goods shipped on board ship, signed by the person who contracts to carry them, or his agent, and stating the terms on which the goods were delivered to and received by the ship. It is not the contract, for that has been made before the bill of lading was signed and delivered, but is excellent evidence of the terms of the contract."

 In this case the contract is attested by the letter of confirmation, which shows that the agreed rate was $8, and the rate shown on the bill of lading is not controlling. See also, Scrutton, pp. 56 and 57, and Carver on Carriage of Goods by Sea (6th Edition) § 56, p. 72.

 The shipper was to pay the $8 per thousand on lumber stored. If the carrier collected $10 per thousand on such part of the cargo sold, it did not pay the $2 to the shipper as a refund, for it was charged but $8, the remainder of $2 being applied to the balance of freight due. This was no rebate or refund as these terms are commonly understood.

Neither can there be said to have been a concealment. The only other large shipper on the Cedar and the Oak received a like rate. Still another shipper offered and paid an $8.-50 rate on the Cedar, but this shipment was quite small. In regard to this transaction, the carrier testified: "I had an offer of $8.50 on the two car loads, which I accepted, figuring it was a higher rate than the prevailing going rate." Which indicates that the $10 rate was apparently not enforced.

Furthermore, there was no advantage gained by the shipper, because much of the lumber that went to make up the cargo on each of these vessels was put into storage, for which charges were to be paid.

Appellants strongly rely upon the Prince Line Case [Prince Line, Ltd., v. American Paper Exports, Inc., 55 F.(2d) 1053, 1055 (C. C. A. 2)].

The Prince Line was a member of the "Far East Conference," a group of shippers who entered into an agreement fixing rates for carriage of goods from the United States to Asiatic ports, which agreement was filed with the Shipping Board and approved by it. The agreement was quite detailed in its nature, and among other things provided rates for twelve classes of paper; the last class being paper "not otherwise specified." The American Paper Exports, Inc., a patron of the Prince Line, prepared the bills of lading on paper shipments, leaving the rates blank. There was a disagreement between the shipper and the carrier as to the rates to be charged. The carrier claimed that it entered the rate fixed by the "conference" tariff upon being advised of the contents of the shipments; the shipper claimed that the choice of rate was left to it. The issue narrowed down to whether the rate was agreed to regardless of contents, or whether the established rates were to be fixed after declaration by the shipper. Competitors of the carriers complained that unclassified paper was being shipped at cut rates. The shipper took the position that, if the carrier wished to hold the business, it must accept unclassified paper at rates fixed by the shipper without information as to its class, which would not be disclosed by the shipper. The carrier accepted and charged such rates as the shipper dictated. Suit was brought by the carrier on the theory that the established rate was the contract rate, and also that, if cutting rates was contemplated by the contract, it would be invalid, and the established rates could still be recovered. The court, in affirming the decree in favor of the carrier, said: "* * * It is conceded that the billing was to conceal the contents from the company's competitors, and it thus facilitated the preference which had been conceded. This was an 'unfair device or means,' for it destroyed that equality of treatment between shippers. * * * The law did not forbid all concessions to a shipper; apparently it assumed that if these were above board, and known or ascertainable by competitors, the resulting jealousies and pressure upon the carrier would be corrective enough. But it did forbid the carrier to grant such favors, when accompanied by any concealment. * * *"

In the case here there was no concealment as forbidden by statute; a competitor was given the same rate as the Bloedel Donovan Lumber Mills. There was no showing of unfairness, nor of unreasonableness of rate, in view of the prevailing conditions and the fact that the carrier's vessels were desperately in need of east-bound tonnage. The contents were known to all who cared to inquire. There is another important difference from the Prince Line Case; there the tariff agreement was in force at the very time the rebate contract was entered into, which was not the case here.

 One carrier agreement in this case was dated October 16, 1931, filed October 19th and approved October 21st. The contract relative to shipment on the Hemlock was made on October 12th and confirmed on the 13th, clearly without the time set for this carrier's agreement, which was expressly said to be "from this date up to and including October 31, 1931. * * *" As to the shipments on the Pine, Cedar, and Oak, the contract with appellee was made and confirmed on November 2, 1931, after the expiration of the October carriers' agreement and eleven days before the signing of the November carriers' agree-

ment, which was filed on November 16th and approved on the 18th. These carriers' agreements do not apply to the shipments in question.

, Decree affirmed.