**HOHENBERG BROTHERS COMPANY,**
Petitioner,

v.

**FEDERAL MARITIME COMMISSION**
**and United States of America,**
Respondents.

No. 16870.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 13, 1962.

Decided Feb. 14, 1963.

---

Mr. Alan F. Wohlstetter, Washington, D. C., with whom Mr. Ernest H. Land, Washington, D. C., was on the brief, for petitioner.

Mr. Thomas D. Wilcox, Atty., Federal Maritime Commission, with whom Messrs. James L. Pimper, Gen. Counsel, and Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, were on the brief, for respondents. Mr. Irwin A. Seibel, Atty., Dept. of Justice, also entered an appearance for respondent United States of America.

Before WASHINGTON, DANAHER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

The Federal Maritime Commission ordered Hohenberg Brothers Company, an important cotton shipper, to cease attempts to obtain reduced transportation rates contrary to Section 16 of the Shipping Act of 1916.[1] Appealing from that order,[2] Hohenberg asserts (1) that there is no evidence that it acted "knowingly and willfully" in obtaining such rates, and (2) that a false claim for refund, which the carrier knows is false, is not, as found by the Commission, an "unjust or unfair device" within the meaning of the Act. We affirm the order of the Commission.[3]

---

1. 49 Stat. 1518, 46 U.S.C. § 815, which, in pertinent part, provides:

   "It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable."

2. In the same order States Marine Lines, Inc. was directed to cease violations of Section 16 for its part in these events. States Marine has not appealed.

3. This is the first civil case to arise under the portions of the Act which regulate shippers. There has been one very recent criminal case. See United States v. Peninsular and Occidental Steamship Co., S.D.N.Y., 208 F.Supp. 957. (1962).

The Pacific Coast European Conference has established the following rates for cotton based on density—space, as well as weight, being a prime consideration in fixing marine tariffs:

Standard Density B—27 to 32 lbs. per cu. ft.—$2.45 per cwt.

Standard Density A—22½ to 27 lbs. per cu. ft.—$270 per cwt.

In June, 1957, Hohenberg made a large sale of cotton to a German textile firm and contacted States Marine Lines, Inc. to arrange shipment. Hohenberg advised a vice president of States Marine that certain of the bales to be shipped were "oversized," meaning of insufficient density to justify the $2.45 rate. The States Marine representative promised to accept any tariff classification which Hohenberg directed for the shipment. Hohenberg placed a classification of Standard Density B on the cotton and States Marine issued shipping documents reflecting that classification. There was a delay in loading the cotton, however, and the inspectors [4] for the Pacific Coast European Conference caught up with the shipment. They took sample measurements on four of the six lots which showed that the average weight of the bales was well below 27 pounds per cubic foot.[5] As it was required to do by the conference agreement, States Marine then rebilled the four lots at the higher Standard Density A rate, retaining the lower rate on the two untested lots.

Hohenberg paid the higher charge but then demanded a refund on the ground that the bales weighed more than 27 pounds per cubic foot. Hohenberg had no direct evidence to support this assertion. The sole ground for its demand was that the bales were so-called "Murray gin-pressed bales," which Hohenberg alleged always weighed more than 27 pounds per cubic foot. To establish their good faith belief in this proposition,

Hohenberg presented at the hearing a letter from the Murray Company saying that when "properly operated and under normal operating conditions" the Murray press is "capable of producing 500-pound bales of 27/28 pound density per cubic foot." There was no evidence of the conditions under which these bales were produced.

States Marine made the refund of $513.17, largely at the urging of its Nashville agent who stated in a contemporaneous memorandum:

"Hohenberg was aware that some of the bales were oversized but were of the understanding that we would protect them with the $2.45 rate on the entire 600 bales provided actual measurements were not taken by the Inspection Bureau.

\* \* \* \* \* \*

"As the market conditions are at the moment very precarious and the Japanese doing all possible to preroute shipments via Japanese flag vessels, I would suggest that you do all possible to have an adjustment made in behalf of Hohenberg, who support States Marine Lines wherever possible."

The same vice president of States Marine who had agreed to accept Hohenberg's classification of the shipment replied:

"Frankly, the inspector was justified in imposing this penalty because Hohenberg in Fresno informed me that the bales were oversized but he had hoped they would be cleared before the inspector caught up the shipment.

"Since the inspector examined the bales before they were loaded and issued an inspection report, there was no choice other than for us to follow through. However, because of Woody's outline to you of this situation, we are issuing a correction and

---

4. Pacific Coast European Conference retains an independent agency, Pacific Cargo Inspection Bureau, to spot-check shipments on member lines to assure that members adhere to the conference rates.

5. The testers weighed 20 bales out of each 100-bale lot. Out of the 80 bales tested, only six reached the *minimum* weight of 27 pounds per cubic foot.

will try to conceal it from the Inspection Bureau, which I am sure we can do."

■ In 1959 a Congressional committee was conducting an investigation of the ocean freight industry and subpoenaed many records from States Marine, including those concerning the above transaction. In October, 1959, the president of States Marine wrote Hohenberg that he was about to be questioned concerning the transaction:

"Our officers are to appear before the Committee starting next Tuesday. In preparation for the giving of testimony, we have been reviewing some of the papers which the investigators took from our files. Among others, we find that they took some inter-office letters of our Company from which it appears that we transported 600 oversized bales of your cotton on voyage #1 of the SS ALCA from San Francisco to Bremen at the rate of $2.45 per 100 pounds, whereas, because the bales were oversized the correct rate should have been $2.70 per 100 pounds. This vessel loaded in early January, 1958.

"This transaction did not come to the attention of our executives until we were reviewing the papers above referred to, and we have no doubt that your executives will not have heard of the matter until you receive this letter.

"Under the circumstances, Section 16 of the Shipping Act makes it our legal obligation to collect from you and your obligation to pay an amount which would result in your having paid at the Conference rate for the bales actually transported.

"Accordingly, we are enclosing a debit note in the sum of $771.85 to correct the mistake above referred to."

Hohenberg immediately, without a hint of protest, repaid the entire $771.85, thus not only returning the refund, but paying the higher rate on the two untested lots. We think the above described course of conduct clearly constitutes substantial evidence that Hohenberg "knowingly and willfully * * * obtain[ed] transportation * * * at less than the rates or charges which would otherwise be applicable." [6]

■■ Hohenberg argues that, in any event, what it did in this case does not constitute an "unfair or unjust device" within the meaning of Section 16, because its actions did not amount to fraud upon the carrier, and a non-fraudulent device cannot be unfair or unjust. But there is nothing in the language of the statute to support this construction. Moreover, reference to the legislative history convinces us that this interpretation was not intended by Congress. The hearings and the Committee reports show that Congress was concerned both with protection of carriers against unscrupulous shippers,[7] and of honest shippers against unscrupulous competitors, acting independently,[8] or in collusion with a carrier.[9] Thus appellant's construction

6. Hohenberg also contends there is insufficient evidence that the bales in fact weighed less than 27 pounds per cubic foot. The report of the testing agency, however, which was admitted in evidence without challenge, amply supports this finding.

7. See Hearings Before the House Committee on Merchant Marine and Fisheries on S. 3467, 74th Cong., 2d Sess., pp. 3, 10, 21; H.R.Rep. 2205, 74th Cong., 2d Sess., p. 2; H.R.Rep. 2598, 74th Cong., 2d Sess., p. 4.

8. See Hearings, supra, Note 8, at pp. 3, 13, 16, 22; H.R.Rep. 2205, supra, Note 8, at p. 2; H.R.Rep. 2598, supra, Note 8, at p. 3.

9. See Hearings, supra, Note 8, at pp. 5, 17. A representative of the shippers testified:

"* * * We believe that some quick action should be taken by our Government to make it a criminal offense for *any steamship line or shipper* to falsify weights, * * *.

"* * * [I]t strikes us that the honorable shipper is wholly at the mercy *of*

would not only add something to the language of the statute, but it would do so in direct contravention of the intent of Congress.[10]

In this case Hohenberg demanded a rebate [11] on the basis of a claim that it knew or should have known to be false. Such action is similar in nature to "false billing," "false classification," etc., and under well known principles of statutory interpretation may properly be considered to come within the comprehensive final phrase "any other unjust or unfair device or means." Moreover, Hohenberg acquiesced in—if, indeed, it did not prompt—actions by States Marine, the carrier, that the Commission found to constitute false billing. The effect of the entire transaction was that petitioner obtained transportation by water at less than otherwise applicable rates in such a way that its competitors were unaware of what had transpired. As Judge Learned Hand pointed out in Prince Line v. American Paper Exports, 2 Cir., 55 F.2d 1053, 1055 (1932), a case involving a carrier's violation, this is one of the evils that Congress sought to end in enacting Section 16.[12]

We conclude that, while Section 16 covers the situation where the carrier is deceived or defrauded, it is not so limited.

There being no error, the order of the Commission is

Affirmed.

*the unscrupulous shipper and steamship company.*" (Emphasis added.) Id. at p. 17.

10. Appellant's reliance upon cases construing Section 10(3) of the Interstate Commerce Act, 25 Stat. 857, 49 U.S.C. § 10(3), is misplaced. The statutory language, the legislative history, and the statutory context are quite different.

11. Hohenberg has argued that Section 16 is inapplicable to rebates. While the statute does not expressly state its applicability to them, if, as here, the rebate is founded on a false claim, it clearly falls within the proscription of Section 16.

12. Hohenberg has argued that we cannot affirm the Commission unless we hold that obtaining a lower rate, without more, constitutes a violation of Section 16. We hold no such thing. Hohenberg's actions in this case went well beyond a mere public request that it be granted lower rates. We affirm because of the way in which lower rates were obtained, not because of the mere fact that they were.