ROCO WORLDWIDE, INC., Appellant,

v.

CONSTELLATION NAVIGATION; Foster-Wheeler Corporation; National Steel Products Company; Medical Coaches, Inc., Appellees,

v.

SALES COORDINATORS LIMITED, Third-Party Defendant.

Federal Maritime Commission, Amicus Curiae.

No. 80–1781.

United States Court of Appeals, Fourth Circuit.

Argued June 3, 1981.

Decided Oct. 1, 1981.

Rehearing and Rehearing En Banc Denied Nov. 18, 1981.

George W. Liebmann, Baltimore, Md. (Stephen L. Snyder, Baltimore, Md., on brief), for appellant.

F. Thomas Rafferty, Baltimore, Md. (Donald E. Sharpe, Piper & Marbury, Baltimore, Md., William H. Morstein, Towson, Md., David W. Skeen, Stephen F. Fruin, Baltimore, Md., on brief), for appellees.

Brien E. Kehoe, Gen. Counsel, Washington, D. C., Clare R. Donelan, on brief, as amicus curiae.

Before HAYNSWORTH, Senior Circuit Judge, WIDENER and HALL, Circuit Judges.

HAYNSWORTH, Senior Circuit Judge:

These are actions by an ocean carrier against four of its customers for the difference between negotiated rates actually charged and the carrier's unamended tariff when the carrier expected to amend the tariff to conform to the negotiated rates but inadvertently neglected to do so within the 180-day period permitted by the statute. The district court dismissed the actions upon concluding that there is no implied private right of action under § 18 of the Shipping Act. 46 U.S.C.A. § 817. Upon the carrier's appeal, we affirm.

## I.

Roco Worldwide, Inc. was a common carrier of ocean freight but neither owned nor chartered a vessel. It solicited freight for ocean carriage and issued its own bills of lading. It would then charter the necessary space on a vessel bound for the port of destination, from which it would receive the vessel's bill of lading. Its profit margin was the difference between the rate negotiated by Roco and the shipper and Roco's actual cost of procuring the ocean carriage.

Roco had on file with the Federal Maritime Commission a tariff which, among other things, provided for cargo not otherwise specified (n. o. s.) at the rate of $15,000 per container for any port in the world. Roco's president, Mr. Ott, testified that the n. o. s. rate was never used. Its practice was to negotiate a rate with a prospective shipper and then to amend the tariff to specify the negotiated rate for carriage of the particular goods to the intended destination.

Roco negotiated an agreement with Constellation Navigation, Inc. to transport a container of spare automobile parts from Baltimore to Kuwait for $2,800, an agreement with Foster Wheeler to transport 140 ranges or household appliances from Los Angeles to Chittagong, Bangladesh for $11,-578.62, an agreement with National Steel Products Co. to transport steel building parts from Baltimore to Saudi Arabia for $15,300, and an agreement with Medical Coaches to transport an ambulance from Baltimore to Manila, Philippine Islands for $6,250. Compared with its tariffs on file at the time, this produced undercharges, respectively, of $13,200, $21,147, $29,700, and $21,020.

Section 18(b)(3) of the Shipping Act, 46 U.S.C.A. § 817(b)(3), requires carriers by water in foreign commerce to charge on the basis of their filed tariffs. Filed tariffs, however, may be amended at any time. According to its president's testimony, Roco's usual practice was to request its agent, Trans-American in Washington, to file an amendment to the tariff to conform to the negotiated agreement. That could be done by Trans-American by telex to the Commission or by completing an amendatory page and filing it with the Commission. As long as that was done on or before the date of the ship's sailing, there was no other requirement and the actual agreement was authorized by the filed tariff. Moreover, in § 817(b)(3) there is an express proviso that if a carrier inadvertently fails to amend its tariff before the shipment, it can waive or refund a portion of the charges by filing a new tariff with the Commission and making application for authorization of the waiver or refund, but the application must be made within 180 days after the sailing of the vessel. Mr. Ott testified that there was usually plenty of time to amend the tariff before the shipment, but the 180-day grace period was available when he needed it.

The president of Roco intended to follow that procedure in the case of these four shipments. He was shorthanded at the time, however, and inadvertently neglected to file any amendment to the tariff with respect to three of the shipments, and filed an amendment intended to legitimate the fourth only after the 180-day period had expired.

Sometime after these shipments had been completed, Roco withdrew from active business. It was subjected to an audit by the Maritime Commission during the course of which these facts were discovered. Under some pressure from the Commission, Roco then sought to recover the additional charges from the shippers, and these actions followed.

Illustratively, the bill sent to National Steel Products, upon which this action is premised, reported that National Steel had been billed for the three containers at $5100 each, for a total of $15,300, whereas the lawful charge should have been $15,000 per container of goods not otherwise specified or a total charge of $45,000. There are in the record, however, amendatory sheets effecting a number of amendments to the $15,000 per container tariff in other transactions. These amendments authorized the shipment of specified goods to specified destinations at rates much below $15,000 per container, but in this case Roco failed to file an amendment authorizing this specific shipment.

## II.

A private right of action may not be inferred here under the authority of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as amplified and explained in subsequent decisions, notably *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 *rehearing denied* 430 U.S. 976, 97 S.Ct. 1668, 52 L.Ed.2d 371 (1977), *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), *Universities Research Association, Inc. v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981), and *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). The requirements of § 817(b)(3) do not even run against shippers. By § 815, shippers are forbidden to engage in certain collusive practices, but there is no collusion involved in the acceptance by a shipper of a negotiated rate with the understanding that an amendment will be filed in conformity with the agreement. Section 817(b)(3) is a requirement of carriers. It requires them to charge rates in accordance with their filed tariffs, though it contemplates post-shipment amendments during the 180-day period. The underlying purpose of the section is thus satisfied, for the benefit of the amendment, whether filed before sailing or within the 180-day period, will be extended to other potential shippers. Carriers are not special beneficiaries of the subsection. They are the class "whose previously unregulated conduct was purposefully brought under federal control by the statute . . . ." *Piper, supra*, 430 U.S. at 37, 97 S.Ct. at 947.[1] The detailed remedial scheme established by Congress makes no provision for carrier collection of tariff rates in excess of its contracts of afreightment. We can find no indication that Congress intended to create a private right of action by carriers against shippers in such circumstances.

Roco, however, also relies on an analogous line of Supreme Court cases construing the Interstate Commerce Act. Since *Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), and *Louisville & Nashville Railroad Co. v. Rice*, 247 U.S. 201, 38 S.Ct. 429, 62 L.Ed. 1071 (1918), the Court has inferred, from the Interstate Commerce Act's requirement that the tariff rate be charged, a right of action in carriers to recover even agreed upon undercharges from shippers. In 1927 and 1940, Congress incorporated these decisions into the statute. The Shipping Act was modeled on the Interstate Commerce Act, and the Court has long directed that each statute should have a like interpretation within its ambit. *See United States Navigation Co., Inc. v. Cunard Steamship Co., Ltd.*, 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932). Because § 817(b)(3) is nearly identical to the tariff provisions of the Interstate Commerce Act effective in 1915, two circuit courts have held that an implied cause of action exists under the Shipping Act as well. *See Maritime Service Corp. v. Sweet Brokerage de Puerto Rico, Inc.*, 537 F.2d 560 (1st Cir. 1976); *Prince Line, Ltd. v. American Paper Exports, Inc.*, 55 F.2d 1053 (2d Cir. 1932).[2]

Were we to follow the lead of the First and Second Circuits, we would face a difficult jurisprudential problem: whether we should recognize an implied cause of action on the basis of venerable Supreme Court precedent, which is analogous but not con-

---

1. The mere right of carriers to fix tariff rates, or the exemption of tariff agreements among members of a conference of carriers from the antitrust laws, 46 U.S.C.A. § 814, is neither a right nor a benefit relevant to the existence of an implied right of action under § 817(b)(3).

2. The *Prince Line* decision involved § 815 rather than § 817(b)(3), and the district court distinguished that case on this basis. We do not find this distinction persuasive. Specific language proscribing shipper circumvention of tariff rates was not added to § 815 until 1936. In 1932, when *Prince Line* was decided, § 815 was substantially similar, for implied cause of action purposes, to § 817(b)(3). In any event, the rationale in *Prince Line* would not brook this distinction, and we are not inclined to read an opinion by Judge Learned Hand so narrowly. For other reasons, however, we must decline to reach the same result.

trolling, when *Cort v. Ash* and its progeny compel a contrary result. *Cf. Stern v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 603 F.2d 1073 (4th Cir. 1979) (discussing an implied private right of action under section 7 of the Securities Exchange Act of 1934). We find, however, that the policies supporting the implication of a private right of action under the Interstate Commerce Act are inapplicable under the Shipping Act, in light of industry practices.

### III.

Under the Interstate Commerce Act, the duly filed rate was the only lawful charge. Deviation from it was not permitted under any circumstances. The carrier was obligated to charge only the tariff rate, and it had a duty to insure that no different charge was levied. Under a system of regulation that countenances no deviation from the published tariffs, or quick amendments to accommodate special agreements, a carrier's right of action to recover for undercharges, even those bargained for, is a sensible, and probably indispensable, tool of enforcement.

But the parties concede that far different practices prevail under the Shipping Act. So long as an amended tariff is filed, no unfair preferences are accorded, and the parties can, and do, freely modify the freight charges.[3] Shippers in identical circumstances can invoke the rates set in an amended tariff, and all shippers are informed that unreasonably high stated rates are negotiable. Since the rates themselves need not conform to the rates announced in previously published tariffs, recognition of a right of action in carriers would not promote unswerving fidelity to the published rates, for established business practice has already compromised that principle. Instead, it would only enrich the carrier who, in a fiercely competitive industry, secured the customer by agreeing to a lower rate, but neglected his responsibility to file the tariff amendment. Such a cause of action would not serve the purposes of the Shipping Act.

Accordingly, we find the rationale in the Interstate Commerce Act cases inapplicable, and implication of a private right of action under § 817(b)(3) unsupportable. The "filed rate" doctrine simply has no application to that portion of the shipping business in which tariffs are readily amended to reflect specific agreements with shippers, and in which such amendments are even authorized during a period of 180 days after the shipment. Whether the current industry practice can be squared with the intent of Congress is a question not before us today. In light of that practice, however, we hold that carriers may not bring a private action under § 817(b)(3) against shippers to remedy deviations from rates published in tariffs.

*AFFIRMED.*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I dissent for the reasons sufficiently expressed in *Maritime Service Corp. v. Sweet Brokerage de Puerto Rico, Inc.*, 537 F.2d 560 (1st Cir. 1976), and *Prince Line, Ltd. v. American Paper Exports, Inc.*, 55 F.2d 1053 (2d Cir. 1932).

I doubt that the custom and practice in an industry is sufficient to overcome a statutory command. However harsh the application of such a rule would make the result in this case, permitting a carrier with regulated rates to deregulate itself by virtue of custom would seem to me to be far worse.

---

**3.** Although the parties agree that this is the industry practice, we have found no support for this view in the scholarly literature or the Commission's amicus curiae brief. If the industry practice conformed to the normal pattern of tariff regulation, we might well reach a different result.