UNITED STATES of America, et al.,
Plaintiffs-Appellants,

v.

OPEN BULK CARRIERS, et al., Defendants,

Union Camp Corporation,
Defendant-Appellee.

No. 82–8519.

United States Court of Appeals,
Eleventh Circuit.

March 19, 1984.

Carol J. Neustadt, Federal Maritime Comn., Washington, D.C., for plaintiffs-appellants.

Edwin D. Robb, Jr., Savannah, Ga., for defendant-appellee.

Before JOHNSON and HENDERSON, Circuit Judges, and ALLGOOD,* District Judge.

ALBERT J. HENDERSON, Circuit Judge:

The United States of America appeals the grant of summary judgment by the United States District Court for the Southern District of Georgia in favor of the appellee, Union Camp Corporation (Union Camp). The main issue in the district court and the sole issue before us focuses on whether Union Camp violated the initial paragraph of § 16 of the Shipping Act of 1916, 46 U.S.C. § 815 by consolidating cargoes for shipment by sea from Savannah, Georgia to Europe with other shippers to avoid the payment of deadfreight penalties to Open Bulk Carriers (Troll, its trade name).[1] Agreeing with the district court that Union Camp is entitled to summary judgment, we affirm.

Union Camp first contracted for Troll to ship liner board from Savannah to northern Europe in the fall of 1970. That contract required Union Camp to ship at least 30,000 long tons of cargo during 1971. Union Camp complied with these terms. In October, 1971 Union Camp and Troll executed another contract for the years 1972–1973,

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. The government asserted a number of claims before the district court, including one that Union Camp operated as a Non-Vessel Operating Common Carrier. The district court found for Union Camp on all issues but the government only appeals the decision of the district court on the purported § 16 violation.

which obligated Union Camp to ship a minimum of 5,000 long tons of cargo per voyage and a total of 60,000 long tons per year. Failure to meet these minimums would necessitate the payment of deadfreight penalties. The rate Troll charged Union Camp was less than the rate applicable to smaller amounts of cargo. The exact rates and minimum tonnages changed during the term of the contract, but the agreement always contained per voyage and yearly minimum requirements. In 1972, Troll became a common carrier and filed its tariffs, including those charged Union Camp, with the Federal Maritime Commission.

Because of worsening economic conditions during 1972 and 1973, Union Camp often was unable to satisfy the minimum tonnage requirements of the contract. To avoid deadfreight penalties, it solicited cargo through the Kraft Export Association (KEA), from competitors which also shipped liner board from Savannah, Georgia to northern Europe. Only Mead Corporation (Mead) and Continental Can Corporation (Continental Can)[2] agreed to combine their shipments with those of Union Camp. Troll had knowledge of these combined shipments. Union Camp made no profit on the arrangement, paying Troll the full amount and then billing Mead and Continental Can for their pro rata shares. Troll ships made six voyages with combined cargoes in 1972 and seven in 1973. By this device, Union Camp, Mead and Continental Can all shipped cargo at rates lower than if they had shipped separately. Even with the combined cargoes, Union Camp could not supply all the minimum tonnage for 1972. Troll still charged the lower rate and Union Camp paid approximately $50,000.00 in deadfreight penalties. In 1973, Union Camp, because of the combined cargoes, did not pay any deadfreight penalties and again received the lower volume rate.

Neither the bills of lading nor the ship's manifests identified Continental Can or Mead as the shippers of their cargoes. J.K.

Ebberwein Company was Union Camp's freight forwarder and listed Union Camp as the shipper for its portion of the cargo. According to Union Camp, Mead and Continental Can made their own freight forwarding arrangements. On the documents covering the Mead cargoes the shipper was listed as "J.K. Ebberwein, as agent" although the order numbers on the documents had an "MB" prefix and corresponded to Mead's sales invoices. The documents for the Continental Can cargo listed "C.M. Thompson, as agent" as the shipper. All the parties knew who owned the cargo but Mead and Continental Can did not want their European customers to know that Union Camp, a competitor, had been involved in the transaction.

Union Camp and Troll signed another contract in late 1974 covering the year 1975. This contract again contained per voyage and yearly minimum tonnage amounts. Union Camp generally could not meet these requirements but it did not consolidate any cargo in 1975. At the end of the year, Union Camp paid $112,000 in deadfreight penalties, based, Union Camp claims, upon the amount of unfilled Troll hold space. The government, however, contends that Union Camp owed $261,399.51 in penalties under the contract with Troll.

In its complaint, the government alleged a number of violations of the Shipping Act, 46 U.S.C. § 801 *et seq.* by Union Camp and J.K. Ebberwein. The district court denied the government's motion for a stay pending an investigation and hearing by the Federal Maritime Commission. *United States v. Open Bulk Carriers, Ltd.,* 465 F.Supp. 159 (S.D.Ga.1979). The government filed lengthy proposed findings of fact to which Union Camp submitted responses.

Both the government and Union Camp moved for summary judgment. After hearing arguments, the court issued a comprehensive decision granting summary judg-

---

**2.** Mead and Continental Can settled with the government and were dismissed by the district court.

**1064**

ment for Union Camp.[3] As the court stated in denying the stay, "few, if any, material factual issues are in dispute. The issues to be decided are questions of law, that is construction of the applicable tariff and statutes...." *Id.* at 166. *See Union Pacific Land Resources Corp. v. Moench Investment Co., Ltd.,* 696 F.2d 88, 93 n. 5 (10th Cir.1982) *cert. denied* —— U.S. ——, 103 S.Ct. 1776, 76 L.Ed.2d 348 (1983). Neither party contends that factual questions are unresolved. At oral argument, the government stated that the facts are undisputed and the issue is only one of applying § 16.

The court held that there was some concealment with the consolidated cargoes but that such concealment was not used as a means to achieve the lower rate. The court also noted the Interstate Commerce Act, which expressly permits such a practice in land transportation. 49 U.S.C. § 10562.[4] With respect to the 1975 penalty payments, the court found no concealment and, in any event, no evidence that concealment had been a means to lower rates.

The main thrust of the government's argument against Union Camp is that it achieved lower rates by unjust and unfair devices in violation of § 16, initial paragraph, by combining cargoes and thereby benefiting from the lower rate and allegedly paying less deadfreight penalties than provided in the 1975 contract. Section 16, initial paragraph provides, in part, that

[i]t shall be unlawful for any shipper, consignor, consignee, forwarder, broker or other person ... knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water at less than the rates or charges which would otherwise be applicable.

46 U.S.C. § 815 (initial paragraph).

The government does not argue that consolidation in and of itself constitutes an "unjust or unfair device or means." Instead, it claims that Union Camp made a false claim to the lower rate because it alone had contracted to ship the required amounts of cargo. Allegedly, the consolidated shipments were unknown to the shipping public and the shipping documents provided further evidence of concealment. It further notes that the 1975 negotiations concerning deadfreight penalties was just the last transaction in a series of events to falsely claim lower rates. Finally, the government asserts that the concealment need not be the means by which the lower rates are achieved but it is sufficient if they are "accompanied by any concealment...." *Prince Line v. American Paper Exports,* 55 F.2d 1053, 1055 (2d Cir.1932).

■ It is undisputed that fraud or concealment is a necessary ingredient in the proof of an unjust or unfair device or means. *Capitol Transportation, Inc. v. United States,* 612 F.2d 1312 (1st Cir.1979). It is such fraud or concealment that in fact makes the practice unjust or unfair. Whether an act constitutes an unfair or unjust device under § 16 depends on its similarity to false billing, false classification or the other prohibited conduct. *Hohenberg Brothers Co. v. Federal Maritime Commission,* 316 F.2d 381 (D.C.Cir.1963). In

---

**3.** The court also granted in part Ebberwein's motion for summary judgment although it found that he had violated a Federal Maritime Commission regulation, 46 C.F.R. § 510.24(a), by not listing the name of the actual shipper on the bill of lading. The government does not appeal from this portion of the district court's judgment.

**4.** Union Camp contends that because the Interstate Commerce Act permits a similar course of conduct in land transportation, their use of combined cargoes does not violate § 16. The

government maintains that this provision of the Interstate Commerce Act differs from the Shipping Act and is inapplicable here. Admittedly, Congress intended the two Acts to be interpreted similarly. *United States Navigation Co. v. Cunard S.S. Co.,* 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932). But there is an exception when the provisions are dissimilar. *Id.* at 481, 52 S.Ct. at 249, 76 L.Ed. at 412. Because of our resolution of this case, we express no opinion as to the applicability of the Interstate Commerce Act to these facts.

*Capital Transport, supra,* the court held that a good faith refusal to pay disputed charges alone does not contravene § 16. But the shipper made claims which it knew or should have known were false. This supplied the required fraud or concealment. "[T]he requisite element of fraud or concealment was established ... by Capital's 'unexplained and apparently unjustified avoidance of any payment of the amounts found due and owing.'" 612 F.2d at 1323. Thus, the refusal to pay, instead of constituting an innocent act, became an unjust or unfair means or device to violate § 16.

■ The statute prohibits a shipper from receiving the benefits of lower rates "*by means of* ... any other unjust or unfair device or means...." (emphasis added). It therefore requires the lower rates to be achieved by *means* of the fraud or concealment, which are necessary elements of the term "unjust or unfair device or means." The Federal Maritime Commission which is charged with enforcing the Shipping Act, stated that § 16 second and § 16 initial paragraph

> are aimed at protecting competing shippers and carriers from shippers who attempt to obtain (or succeed in obtaining) transportation at reduced rates through devices or representations involving fraud, falsehood, or concealment.

*Pacific Far East Lines,* 11 F.M.C. 357, 362 (1968) *aff'd on other grounds sub nom. Pacific Far East Lines, Inc. v. Federal Maritime Commission,* 410 F.2d 257 (D.C.Cir. 1969). Hence, the means through which lower rates are obtained must include fraud or concealment.

The government takes the position that the concealment need only accompany the practice, citing *Prince Line, supra.* But as Judge Learned Hand wrote in *Prince Line,* "the billing was to conceal the contents from the company's competitors, and it thus facilitated the preference which has been conceded." 55 F.2d at 1055. The concealment involved helped effectuate the lower rates. In *Hohenberg Brothers Co., supra,* the court also required evidence of fraud or concealment in the scheme of the shipper to procure lower rates. The shipper demanded a rebate on a claim it knew or should have known was false. The court found that Hohenberg had violated § 16 "because of the way in which lower rates were obtained, not because of the mere fact that they were." 316 F.2d at 385 n. 12.

■ The government attempts to characterize the actions of Union Camp as a fraud upon "the shipping public". Purportedly, others who might desire to ship through Savannah were deceived as to Union Camp's actual transportation costs. In *Pacific Far East Lines, supra,* the carrier, to keep the shipper's business, contracted with the shipper to buy fuel oil. The shipper, however, was not in the oil business and assigned the contract to an oil company and received a commission. No other shipper knew or could have discovered this agreement and the Federal Maritime Commission determined that it was an unjust or unfair means or device. The failure to disclose to competing shippers was the "fatal defect in the arrangement...." 11 F.M.C. at 365.

It is this analogy that the government seeks to draw to the facts in this case. The district court, however, concluded that the other members of the KEA knew of the arrangement and that Union Camp "made no attempt to conceal for the purpose of receiving lower rates." Record at 875–76. The court stated that "the record establishes beyond doubt that Union Camp made every effort to *avoid* such concealment." *Id.* at 876. This conclusion is supported by the record. In fact, the government, in advancing its claim that Union Camp was a Non-Vessel Operating Common Carrier, told the court that "Union Camp solicited from every liner board manufacturer shipping from Savannah ..." Transcript at 9, and that Union Camp "was prepared to carry all liner board cargo from all people shipping from Savannah." *Id.* at 27. The government, by this statement, contradicted its allegation that Union Camp surreptitiously contacted only a few other shippers. It is apparent from the record that Union Camp made every effort to contact its com-

petitors for the purpose of fulfilling its minimum shipment requirements. The shipping documents arguably constituted concealment of some information. But whatever concealment that did occur was not used as a means to achieve lower rates, which, as discussed above, is necessary to qualify as an unjust or unfair device or means.

The facts in this case are comparable to those in *Ambler v. Bloedel Donovan Lumber Mills,* 68 F.2d 268 (9th Cir.1933). There, the bills of lading covering the cargo stated the transportation rate to be $10.00 per 1,000 feet of lumber. Yet because of a shortage of cargo from the west coast to the east coast, the actual rate was $8.00. The government charged that the shippers had violated § 16 but the court found no concealment because other shippers using the carrier received a similar rate. Distinguishing *Prince Line,* the court stated

> In the case here there was no concealment as forbidden by statute; a competitor was given the same rate as the Bloedel Donovan Lumber Mills. There was no showing of unfairness, nor of unreasonableness of rate in view of the prevailing conditions and the fact that the carrier's vessels were desperately in need of eastbound tonnage. The contents were known to all who cared to inquire.

*Id.* at 271. Here, also, all the competitors were offered a similar rate and the other liner board shippers from Savannah knew or could have known of the arrangement through the KEA.

In the same vein, we cannot accept the government's assertion that Union Camp made a false claim to lower rates because it promised, by its contract, to provide all the cargo itself. Although the contracts do not specifically provide for consolidation of shipments, neither do they expressly prohibit it. The contracts do not set forth any conditions as to the ownership of the cargo. In any event, there is no violation of § 16 because there was no concealment. Troll and Union Camp's competitors knew that Union Camp did not own all the cargo.

■ Finally, the government urges that Union Camp's payment of $112,000.00 in deadfreight penalties instead of the higher contract amount in 1975 constituted a violation of § 16. It is true that in some instances refusals to pay charges can amount to such a violation. *Capital Transport, supra.* However, Union Camp paid the agreed sum calculated by Troll based on the amount of unfilled hold space. The district court found that "[h]ere there has simply been no suggestion that any concealment was carried out or even attempted." Record at 876. And even if there was some concealment, it did not serve as a means to achieve lower rates. The court in *Capital Transport* stated that a "good faith refusal to pay a disputed rate or charge ..." did not contravene § 16. 612 F.2d at 1323. There is no allegation that Union Camp made any claims it knew were false as to the deadfreight penalties or that Union Camp and Troll calculated the amount unreasonably or in bad faith and to the detriment of others.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

JOHNSON, Circuit Judge, dissenting:

I do not agree that Union Camp's consolidation of cargoes and renegotiation of deadfreight penalty fees did not constitute unjust or unfair devices under Section 16 of the Shipping Act, and I therefore dissent from the decision of the majority.

A central policy concern behind the Shipping Act of 1916 was the prohibition of discrimination in the rates that common carriers charge to the shippers whose cargo they transport. *Compania Anonima Venezolana de Navegacion v. A.J. Perez Export Co.,* 303 F.2d 692, 696 & n. 11 (5th Cir.1962). The Shipping Act and all of its amendments reflect this "rigorous policy which ... prohibit[s] not only discrimination but the possibility of it...." *Id.* (footnote omitted). Thus, common carriers such as Troll are required to file with the Federal Maritime Commission (FMC) tariffs that set forth the rates and charges for specific goods carried between specific ports. 46 U.S.C.A.

§ 817(b)(1). Each tariff is required to reflect "the one and only rate to be charged and collected for the specified transportation service." *United States v. Stephens Brothers Line,* 384 F.2d 118, 120 (5th Cir. 1967) (footnote omitted). A common carrier and shipper who wish to contract for a special service or rate can legally do so only if the carrier publishes the special service or rate in its tariff, thus making it equally available to all shippers. *Kansas City Southern Railway Co. v. Carl,* 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913).

The policy against rate discrimination is evident in the prohibition contained in Section 16 of the Shipping Act, 46 U.S.C.A. § 815, against the use of any unjust or unfair device to obtain or attempt to obtain water carriage at less than the applicable rate. *See Prince Line Ltd. v. American Paper Exports, Inc.,* 55 F.2d 1053, 1055 (2d Cir.1932) (Hand, J.) (primary purpose of Section 815 is maintenance of equality of treatment between shippers). The policy concern, again, extends not only to discrimination, but also to the possibility of discrimination. The decision of the majority in this case, that the lower shipping rate achieved by Union Camp's consolidation of cargo under a tariff that did not explicitly permit consolidation and its renegotiation of deadfreight penalties without a corresponding revision in Troll's filed tariff did not violate Section 815, does not adequately protect against the possibility, if not the reality, of rate discrimination.

An unjust or unfair device under Section 815 must employ some fraud or concealment. *Capital Transportation, Inc. v. United States,* 612 F.2d 1312, 1323–24 (1st Cir. 1979). The majority finds no concealment from the consolidation of cargo because, in its effort to find shipments for consolidation, Union Camp contacted some of the members of its trade association. Disclosure to some shippers, however, does not mean that no concealment has occurred. When the law requires that tariffs filed with the FMC reflect the rate actually charged for specified transportation services, and when the tariff does not indicate whether combined cargoes are permitted,

then, when cargoes are combined to achieve the lower rate, concealment is avoided only by the filing of an appropriate tariff revision to reflect the amended agreement. In the absence of a filed revision, the consolidation involves concealment and constitutes an unjust device under Section 815. The same principles apply when the amended agreement between shipper and carrier provides for a renegotiation of deadfreight penalties.

Thus, by means of the undisclosed consolidation of cargo and renegotiation of deadfreight penalties, Union Camp obtained ocean carriage for its cargo at a rate lower than otherwise applicable, in violation of 46 U.S.C.A. § 815. Accordingly, I dissent from the decision of the majority.