CAPITOL TRANSPORTATION,
INC., Petitioner,

v.

UNITED STATES of America and
Federal Maritime Commission,
Respondents,

Sea-Land Service, Inc., et al.,
Intervenors.

No. 79–1047.

United States Court of Appeals,
First Circuit.

Argued Sept. 5, 1979.

Decided Dec. 13, 1979.

Daniel R. Dominguez, Hato Rey, P.R., with whom Laffitte & Dominguez, Hato Rey, P.R., and Carlos Rodriguez, Bayamon, P.R., were on brief, for petitioner.

Anne E. Mickey, Atty., Federal Maritime Commission, with whom John H. Shenefield, Asst. Atty. Gen., Barry B. Grossman, Robert J. Wiggers, Attys., Antitrust Division, Department of Justice, Brien E. Kehoe, Gen. Counsel, and Edward G. Gruis, Deputy Gen. Counsel, Washington, D.C., were on brief, for respondents.

Paul J. McElligott, Washington, D.C., with whom Ragan & Mason, Washington, D.C., was on brief, for intervenors.

Before COFFIN, Chief Judge, KUNZIG,* Judge, U.S. Court of Claims, and CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Capitol Transportation, Inc. ("Capitol") petitions for review of a report and order of the Federal Maritime Commission finding it in violation of Sections 16 and 18(a) of the Shipping Act of 1916, 46 U.S.C. §§ 815 and 817(a). The Commission awarded reparation in the amount of $57,940 plus eight percent interest to Maritime Service Corporation ("MSC") for container demurrage charges owed by Capitol.[1] Capitol challenges the Commission's order on a variety of grounds, none of which we find meritorious.

MSC was organized with Federal Maritime Commission approval in 1970 to serve as a central collection agency for the billing and collection of container demurrage charges owed to so-called ocean carriers. *See Maritime Service Corp. v. Sweet Brokerage De Puerto Rico, Inc.,* 537 F.2d 560, 561 (1st Cir. 1976). These carriers are in the business of transporting on their vessels

property packed in intermodal containers or highway trailers which they provide, at the beginnings and the ends of journeys, for limited use by shippers and consignees. MSC was formed to prevent the shippers and consignees from obtaining compromises and concessions on demurrage by playing one carrier against another. The shippers and consignees had become accustomed to using the leverage of their continued business to coerce the ocean carriers into settling demurrage claims for less than the tariff rate. *Puerto Rico Trades—1968,* 17 F.M.C. 251, 257.

Capitol is a Puerto Rico corporation devoted primarily to the movement of household goods between different parts of the world and Puerto Rico. In arranging for the carriage of these goods, Capitol contracts directly with various ocean carriers who in turn solicit Capitol for business. As a member of various forwarding and transportation organizations, Capitol holds itself out as offering a variety of transportation services including general warehousing; trucking; storage, packing and shipping of household goods; and local and long distance moving.

MSC began billing Capitol for demurrage in October 1970. Prior to this first billing, a group of shippers and consignees including Capitol, organized under the name Import and Export Council of Puerto Rico, resolved not to "recognize, or honor, billings for demurrage submitted by Maritime Services Corporation . . . ." Capitol was an early member and organizer of the Council, and its president, Charles Darmanin, served as Council secretary. On October 1, 1970, Darmanin, writing on behalf of Capitol, informed MSC that:

"We have your printed form letter which is undated and unsigned informing us that Maritime Service Corp. has been formed to handle demurrage claims.

"Please be informed that I will not honor any billing or correspondence from your Corporation.

---

* Sitting by designation.

1. Demurrage charges are "charges to be assessed shippers or consignees who detain the carriers' freight containers beyond an allowable 'free time.'" *Maritime Service Corp. v. Sweet Brokerage De Puerto Rico,* 537 F.2d 560, 561 (1st Cir. 1976).

"Services such as carriage, booking and other related information, has been contracted directly through the steamship company. I do not see any reason why we have to deal with a third party.

"Steamship companies solicit us directly for business; therefore, we feel that if there is any problem, it should be settled directly between us."

Capitol, as promised, consistently refused to honor MSC's demurrage billings,[2] and on April 30, 1971 MSC brought suit against Capitol in the United States District Court for the District of Puerto Rico.[3] On January 26, 1973 MSC filed a complaint with the Federal Maritime Commission against Capitol and twenty-two other respondents seeking reparation under Section 22 of the Shipping Act, 46 U.S.C. § 821.[4] The complaint alleged that each respondent was "a forwarder or shipper and a common carrier by water" and that by refusing to pay demurrage had violated Sections 15, 16, 17 and 18(a) of the Shipping Act, 46 U.S.C. §§ 814, 815, 816 and 817(a). MSC requested that the Commission order each respondent to cease and desist the Shipping Act violations, to pay the container demurrage charges, and to pay interest at the rate of eight percent on the charges owed. Several of the respondents to the agency proceeding, including Capitol, moved to dismiss on the ground that, although they were common carriers for other purposes, they were "shippers" vis-a-vis the ocean carriers and therefore not subject to Commission jurisdiction in a reparation proceeding under Section 22.[5] The Administrative Law Judge (ALJ) denied these motions finding that as forwarders and common carriers the respondents were subject to the Act even though they also might be shippers vis-a-vis the underlying water carriers. The Commission upheld the ALJ.

In March 1973 MSC and Capitol each appointed auditors to review Capitol's demurrage account, MSC supplying relevant billing documents. Upon conclusion of the joint audit, however, Capitol refused to honor the adjustments endorsed by its own auditor and did not tender payment of any of the outstanding balance due.

Pre-hearing conferences were held on June 16, 1975 and September 23, 1975. Both before and after those conferences, upon motion of MSC, nearly half of the agency respondents were dismissed on the grounds that they were no longer in existence, that service could not be effected, or that settlement had been reached. An initial hearing was held on October 14, 1975 before Administrative Law Judge Morgan at which time MSC presented testimony of two witnesses. Capitol offered the written testimony of its President, Charles Darmanin, and several exhibits. MSC waived

---

**2.** Capitol, at one time, did offer to settle its account for one-third of the amount allegedly owing. MSC rejected this offer.

**3.** On January 22, 1975 the district court, acting upon Capitol's motion, dismissed the complaint finding that exclusive primary jurisdiction was vested in the Federal Maritime Commission. The United States and the Commission now take the view in their joint brief, "that the Court's holding that the Commission's jurisdiction is exclusive was probably erroneous." This, of course, is water over the dam, no appeal having been taken from the district court's judgment, and we accordingly do not comment. *But see Maritime Service Corp. v. Sweet Brokerage De Puerto Rico, Inc.*, 537 F.2d 560 (1st Cir. 1976).

**4.** The term "respondents" as used herein refers to Capitol and the other original respondents in the reparation proceeding before the Commission. The roles are of course different in this court, Capitol being the petitioner in this review proceeding, and the government parties being respondents.

**5.** In its argument in support of its motion to dismiss, Capitol conceded "the respondents in this case are in the great majority NVOCC [non-vessel operating common carriers]," but argued that such NVOCC should be deemed shippers in their relationship to the underlying water carriers, and hence outside the ambit of a section 22 reparations proceeding. Not until later did Capitol adopt its present stance—that the Commission was without grounds for concluding that Capitol was an NVOCC for any purpose. Capitol does not in the present petition for review make its former argument and we do not consider it. *Cf. Chicago, Milwaukee, St. Paul & Pacific Railroad v. Acme Fast Freight*, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 (1949).

cross-examination of Mr. Darmanin without conceding the relevancy or accuracy of the prepared testimony or exhibits, and those documents were received into the record. Following the hearings, settlement was reached with several of the other respondents, with only eight, including Capitol, remaining not dismissed.

After filing of briefs, ALJ Morgan reached his initial decision, served January 18, 1978. The ALJ concluded that,

1) The respondents, by knowingly and willfully refusing to pay demurrage owing under published tariffs, in effect obtained transportation by water at less than the applicable rates and thus violated section 16 of the Shipping Act;

2) The respondents, by entering into unfiled agreements, or by acting in concert pursuant to unfiled agreements, or by participating as members of organizations having the purpose of refusing to honor demurrage billings, or by otherwise engaging in conscious parallel actions in refusing to pay demurrage without a Commission-approved agreement, violated section 15 of the Act;

3) The respondents, by refusing to pay applicable demurrage charges, subjected the property of the shipping public to ocean carriers' liens and thus failed to establish, observe, and enforce just and reasonable practices in connection with the receiving, handling or delivering of property in violation of sections 17 and 18(a) of the Act.

Capitol was ordered to pay MSC $57,940 in demurrage owed, plus interest at the rate of eight per cent.

Capitol and one other respondent filed exceptions to the initial decision, and on August 14, 1978 the Commission served its report and order. The Commission adopted the findings of fact as stated in the initial decision, and agreed with the ALJ's conclusions with respect to the violations of Sections 16 and 18(a). The Commission, however, found that the ALJ's conclusions as to the Section 15 and 17 violations were erroneous. Capitol, still subject to the order requiring payment of demurrage and interest, petitioned the Commission for reconsideration on September 12, 1978. The petition was denied, and Capitol sought review in this court.

## I. *Jurisdiction of the Commission*

MSC filed its complaint against Capitol and the other respondents for reparation under Section 22 of the Shipping Act, 46 U.S.C. § 821, which provides in relevant part:

"Any person may file with the Federal Maritime Commission a sworn complaint setting forth any violation of this chapter by a common carrier by water, or other person subject to this chapter, and asking reparation for the injury, if any, caused thereby. . . . The Commission, if the complaint is filed within two years after the cause of action accrued, may direct the payment, on or before a day named, of full reparation to the complainant for the injury caused by such violation."

Capitol argues that the record is insufficient to support the Commission's ruling that Capitol is, in Commission jargon, a non-vessel operating common carrier (NVOCC) and hence a common carrier by water subject to section 22.[6]

It is not disputed that, in general, a common carrier under the Shipping Act[7] is, as the government maintains, one who expressly or by a course of conduct holds itself out to accept goods for transport by water from whomever offered. *See United States*

6. Capitol argues similarly that it is not subject to Section 18(a)'s proscription against unreasonable and unjust practices in the handling of property, since that section, by its terms, applies only to common carriers by water. As we sustain the Commission's finding that Capitol is such a common carrier, it is unnecessary to address that question separately.

7. Section 1 of the Act, 46 U.S.C. § 801 states merely:

"The term 'common carrier by water' means a common carrier by water in foreign commerce or a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port."

*v. Stephen Brothers Line,* 384 F.2d 118, 121–23 (5th Cir. 1967). It is not necessary, moreover, in order to be such a carrier by water, that one either own or control the means of transportation. *See, e. g., Determination of Common Carrier Status,* 6 F.M.B. 245, 256–57 (1961). As the United States and the Commission state in their joint brief,

> "A person or business association may be classified as a non-vessel operating common carrier by water if he holds himself out to provide transportation by water, contracts and arranges that the goods will be carried and delivered, assumes responsibility or has liability imposed by law for the safe transportation of the shipments, and arranges in his own name with underlying water carriers for the performance of such transportation, whether or not owning and controlling the means by which such transportation is effected. In other words, a company's status as a common carrier depends on the nature of its undertaking with the public which it serves rather than on the nature of the arrangements which it may make for the performance of its undertaken duty." [8]

Capitol does not take issue with the above definition, but argues simply that there "is not one scintilla of evidence in the record . . . that [it] held itself out by tariffs, by advertisement and solicitation or in any other fashion to provide transportation for hire by water in the shipments subject of this proceeding. . . . Nor is there one scintilla of evidence that Capitol Transportation arranged in its own name as shipper with the underlying water carriers for the transportation of the shipments." The Commission, according to Capitol, has mistakenly translated an admission of overland carriage into one of ocean carriage.

█ Capitol's argument is without merit. True, the record is not replete with evidence bearing on the particulars of Capitol's business; but Capitol must bear responsibility for this as it never raised the question of its status as an NVOCC until the ALJ had tendered his adverse decision, some five years after the proceedings had begun. MSC's initial complaint had alleged that Capitol was an NVOCC; Capitol never filed an answer denying this status even though under the Commission's rules material facts not denied are deemed admitted. 46 C.F.R. § 502.64 (1978). Moreover, when joining other respondents in the earlier filed motions to dismiss, Capitol seemed, tacitly at least, to have conceded NVOCC status. *See* note 5, *supra.* Given this posture, MSC was entitled to assume that Capitol's NVOCC status was not in dispute, and the ALJ could hardly be expected to take evidence on a subject which was not, to all appearances, in contention. Nor was the Commission, after closure of the hearing before the ALJ, required to reopen the proceedings in order to accommodate Capitol's eleventh-hour attempt to raise the issue.

█ We add that notwithstanding Capitol's tardiness in raising the point, there is a substantial evidentiary basis for the Commission's finding of NVOCC status. The letter earlier quoted from Capitol's president states that Capitol contracts directly with the ocean carriers for services "such as carriage, booking and other related information," and that such carriers in turn solicit Capitol directly for business. Capitol's letterhead, which was also before the Commission, informs the shipping public that the company performs a variety of transportation services including general warehousing, the trucking, storage, packing and shipping of household goods, and local and long distance moving. The company's letterhead also notes Capitol's membership in various forwarding and transportation organizations. In addition, between October 1, 1970 and May 11, 1973 Capitol had on file with the Commission a tariff which identi-

---

8. *See Pacific Coast European Conference v. Southern Pacific Marine Transport, Inc.,* 16 S.R.R. 863 (1976); *Possible Violations of the Shipping Acts,* 19 F.M.C. 44 (1975); *Puget Sound Tug and Barge Co. v. Foss Launch & Tug Co.,* 7 F.M.C. 43 (1962); *Determination of Common Carrier Status,* 6 F.M.B. 245, 251, 256–57 (1961); *Bernhard Ulmann Co. v. Porto Rican Express Co.,* 3 F.M.B. 771, 775–76 (1952).

fied it as a common carrier. The ALJ properly took official notice of the parties' filed tariffs. *See* 46 C.F.R. § 502.226 (1978).

And finally, Capitol proposed in its opening brief following the hearing before the ALJ that the Commission find as follows:

"5. Respondent Capitol Transport is a puertorrican [sic] corporation devoted mainly to the movements of household goods in between the different points of the world to Puerto Rico. During the time covered by the complaint, Capitol was a prime mover of household goods for members of the Armed Forces of the United States, mainly the United States Air Force and the United States Navy."

Capitol could scarcely accomplish the move of such goods between Puerto Rico and the rest of the world without arranging for ocean transport with the underlying carriers, such action being an admitted attribute of an NVOCC.

Without deciding whether the foregoing would constitute substantial evidence of NVOCC status in a contested proceeding, especially one where contrary evidence had been received, *see United States v. Bianchi & Co.,* 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1962), we have little difficulty in finding such evidence more than sufficient in these circumstances where, at the time of the hearing, Capitol had not even signalled that it disputed the allegations of its NVOCC status contained in MSC's complaint.

## II. *Capitol's Defenses to the Demurrage Claims*

### A. *Capitol as Consignee*

The demurrage charges assessed against Capitol by MSC arose under the published tariffs filed by the various underlying ocean carriers with the Maritime Commission. These tariffs provide for the payment of demurrage by shippers and consignees upon the expiration of stated free time periods granted to allow the unloading and return of trailers to the ocean carrier's terminal. Capitol contends that insufficient evidence was introduced to establish that it was the consignee and therefore liable for the de-

murrage charges. Specifically Capitol argues that it "was not the consignee to the shipments since the consignee was the United States Federal government and/or the United States Armed Forces." Capitol claims it acted merely as trucker and household mover for the government.

In order to establish Capitol's liability for demurrage, MSC introduced copies of Trailer Interchange Receipts ("TIRs"), documents which served as the basis for MSC's computation of charges owed. These TIRs were prepared by the various ocean carriers and submitted to MSC two or three times per week. Each TIR contains information on trailer numbers, vessels, voyages, bills of lading, dates free time began, and dates trailers were pulled out and returned to the carriers' terminal. TIRs are coded with a number previously assigned to each customer. According to testimony offered by MSC, the consignee of a particular shipment is identified on the TIR by the use of this customer code; the consignee's name is also printed in full in the space reserved for "customer name out."

After receiving these TIRs from the ocean carriers, MSC, with the aid of a computer service, prepared invoices summarizing the demurrage owed by the named consignees. These invoices include references to vessel, voyage, bill of lading number, TIR number, trailer number, date free time started, date trailer was returned to the terminal, number of days of demurrage, and charges due. Invoices were mailed to customers with a copy of each of the relevant TIRs, and customers were afforded an opportunity to correct billing errors.

In the administrative proceeding, MSC introduced copies of the appropriate invoices and TIRs. Capitol is listed as "customer" on each, and is identified by its customer code number. As was explained by MSC's witnesses, this would indicate that Capitol was consignee of the various shipments involved.

There is also some further indication in the record of Capitol's having acted as consignee. In a letter from DuPont Puerto

Rico, Inc. to Hiram Cabassa of MSC, DuPont's traffic manager stated: "[Y]ou are definitely not correct in stating that Capitol Transportation is our trucker. They are a moving company and as such a *consignee in their own right*." (Emphasis added.) And in its opening brief filed after the hearing before the ALJ, Capitol, in framing a jurisdictional attack, reasserted its position that "the carriers cannot sue *consignees* for demurrage before the Commission." (Emphasis added.) Capitol, it is clear, has been far from consistent in its disavowal of consignee status.

Despite the introduction of the TIRs identifying it as consignee, Capitol insists that it acted merely as trucker for the United States on the government shipments which it claims comprise eighty percent of its transportation business.[9] In a letter dated October 23, 1973 and introduced into evidence, Mr. Cabassa (of PR Ocean Service Association and MSC) explained to Ruben Figueroa, Capitol's attorney in the agency proceeding, MSC's policy toward the handling of government shipments:

> "Military or government cargoes may be carried either (1) by contracts or tenders between the carriers and the military or government agencies under section 6 of the Intercoastal Shipping Act on government bills of lading or (2) by regular commercial bills of lading under the usual commercial tariffs. MSC does not have responsibility of the former traffic, also known as 'special list traffic' in the MSC manual. Code 7540 eliminates those shipments from MSC billings. The carriers bill and collect the ocean charges and any other charges, including demurrage, from the appropriate military or government agency. However, MSC does bill

> and collect demurrage on the second category of cargoes which would be considered military or governmental, such as household goods and personal effects of military or government personnel, where those cargoes move under commercial bills of lading."

The TIRs introduced in the present case bear the code number 10640, identifying Capitol as customer-consignee. Thus it appears that MSC billed Capitol only for shipments handled under commercial bills of lading naming Capitol as consignee. The ALJ, in his initial decision, noted that "while it is possible that Capitol may have made arrangements with the military for delivery of certain containers of household goods and Capitol may have some claims against the military, nevertheless such arrangements and claims cannot defeat MSC's rights . . . to collect billed demurrage due from Capitol where Capitol was the named consignee. As consignee Capitol was the party responsible for the demurrage." Capitol has pointed to no tariff or decision undermining the ALJ's conclusion.

■ Instead, Capitol contends that the TIRs introduced by MSC identify only the party taking possession of the container rather than the actual consignee. Capitol argues that the bills of lading, not introduced by MSC, are needed if the true consignee is to be identified.[10] In addition, Capitol similarly suggests that the failure of MSC to offer notices of arrival, which the tariffs require be sent no later than the day free time begins, renders the evidence on the issue of Capitol's consignee status insufficient.

> "To determine the existence of a consignee's contractual liability, the courts examine first the bill of lading which 'serves both as a receipt and as a contract.' "

This case hardly stands for the proposition that the bill of lading is the only acceptable evidence of consignee status. From the passage reproduced above it is clear that no dispute existed in the cited case as to who was the consignee; rather it was an identified consignee's obligations that were in issue.

---

**9.** Capitol states that it requested MSC to eliminate the government shipments from their billings and that if this were done it would pay the demurrage owed for civilian shipments.

**10.** Capitol, for example, notes that in *States Marine Int., Inc. v. Seattle-First Natl. Bank,* 524 F.2d 245, 248 (9th Cir. 1975), the court citing the case of *Louisville & N. R. Co. v. Central Iron & Coal Co.,* 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900 (1924), stated the following:

Capitol is mistaken in its assertion that the invoices and TIRs were insufficient to establish, prima facie, that Capitol was consignee. They were adequately "relevant, material, reliable and probative," and thus properly received in evidence, *see* 46 C.F.R. § 502.156 (1978); and in the absence of any more authoritative contrary evidence the Commission could reasonably accept those documents as reflecting the true consignee. If as Capitol suggests, the bills of lading and arrival notices would have shown something different, Capitol was free to seek them out by timely discovery under the Commission's rules. But, it could not, as it did, sit back until discovery had closed or wait until the ALJ decided the case adversely, and then, for the first time, insist that the bills and notices be produced.[11] The evidence submitted supplied ample support for the Commission's finding that Capitol was the consignee and therefore liable for the amount of demurrage assessed. Indeed, since Capitol was best situated to furnish evidence, if there was any, to support its claim that others were in fact liable for the charges, its failure to do so reinforces the impression that the claim is baseless.

### B. *Alleged Failure of Ocean Carriers To Comply with Applicable Tariffs*

Capitol makes another unavailing argument concerning MSC's failure to offer notices of arrival. The ocean carriers' tariffs (using Sea-Land's as an example) provide that "notice of arrival will be given by mail and only to one party at one address, as designated by the shipper on the bill of lading, and not later than the day when free time begins." Capitol, pointing to MSC's failure to introduce into evidence the relevant notices, claims that such a failure estops MSC from pursuing its claim for demurrage. In support of this argument, Capitol relies principally upon the Second Circuit's decision in *Empire Box Corp. v. Delaware, L. & W. R. Co.*, 171 F.2d 389 (2d Cir. 1948). In *Empire*, the plaintiff sought to recover demurrage paid to a railroad for the "constructive placement" of loaded freight cars on its tracks. The applicable tariff required that written notice of such placement be sent. Instead, the parties had agreed that oral notice would suffice. The court held, reaffirming the canon of rigid adherence to published tariffs, that such oral waiver of the written notice requirement was ineffective and that demurrage could not be collected. *See also Davis v. Henderson*, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182 (1924) (waiver of ICC rule requiring shipper to provide written request for railway cars ineffective); *Campbell Construction Co. v. LaCrosse & Southeastern Ry. Co.*, 95 I.C.C.Rep. 603 (1925) (no demurrage where required written notice of arrival not given, even though actual notice received); 6 A.L.R.2d 874.

In the present case the ALJ found that "the record is convincing that the appropriate arrival notices were given to Capitol, [and] that copies are in storage. . . ." The Commission likewise indicated a finding that notice was given. In denying Capitol's petition for reconsideration, it said, "[T]he fact that the TIR's indicate that the containers were in fact picked up and returned by Capitol raises the presumption that Capitol actually received arrival notices for these containers, a presumption Capitol has not rebutted." We agree with the Commission that notice was sufficiently established so as to place upon Capitol the burden of coming forward with evidence to show that such notice was, in fact, inadequate. Thus we reject Capitol's argument

---

11. Capitol seeks to justify its failure to make a timely request for the bills of lading by asserting that MSC "had announced in an answer to an interrogatory that the Bills of Lading would be presented into evidence . . . These interrogatories were served and answered in the [District] Court case which eventually was transferred to the Maritime Commission . . ." The district court action was, however, dismissed, not transferred, at Capitol's request, and Capitol never thereafter sought copies of the bills of lading either before or during the administrative hearing. If Capitol wished to have the bills of lading presented to the Commission, it was required to take the necessary action specified under the Commission's procedures.

that MSC's failure to produce the arrival notices as part of its own case was fatal. On the showing made, it was up to Capitol to establish lack of notice as a defense, and this it failed to do. Capitol first sought copies of the arrival notices at the second pre-hearing conference, after discovery had been closed. The ALJ determined that belated retrieval of the notices at that time would be unduly burdensome to MSC, and declined to order their production. We find nothing unreasonable about this ruling. *See* 46 C.F.R. § 502.20(b)(2). It is true that counsel for MSC indicated, at the pre-hearing conference, that "sometimes they are even oral notices, telephone calls by parties, some of the notices of arrival even came from the [NVOCC's] people themselves back in the States as well as from the carriers . . . ." But the ALJ was not required to treat these vague statements of counsel as establishing that written notice was not ordinarily given, nor were they sufficient reason to relieve Capitol from the consequences of its inertia throughout the discovery period. It is to be observed that Capitol's president, Charles Darmanin, nowhere denied in his written testimony that the notices were received.[12] If Capitol had, in good faith, wished to contest notice, the issue should have been affirmatively raised at an appropriate time.

### III. *Section 16 of the Shipping Act*

The ALJ and Commission found that "[Capitol] by knowingly and willfully refusing to pay demurrage applicable under the published tariffs in effect [has] obtained transportation by water for property at less than the applicable rates and charges in violation of section 16." Section 16 reads, in pertinent part:

"It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person . . . knowingly, and wilfully . . . by means of false billing, false classification, false weighing, false report of weight, *or by any other unjust or unfair device or means* to obtain or attempt to obtain transportation by water for property *at less than the rates or charges which would otherwise be applicable.*" 46 U.S.C. § 815. [Emphasis added.]

Capitol contends that Section 16 was intended to cover only situations where elements of falsification, fraud or concealment by the offending party are shown. In support of this position Capitol points to the Commission's decision in *Pacific Far East Lines—Alleged Rebates*, 11 F.M.C. 357, 364 (1968), *petition for review denied, Pacific Far East Lines v. FMC*, 133 U.S.App.D.C. 269, 410 F.2d 257 (D.C.Cir.1969); there the Commission noted that the statutory words "other unjust or unfair device or means" have a "restrictive meaning derived from their proximity to the words false billing, etc." and that "the courts have uniformly held that the act forbidden must be similar to those specifically proscribed in order to be an unjust or unfair device or means." The *open* refusal of a business entity to pay demurrage charges and its defense against such charges, Capitol argues, cannot reasonably be held subject to Section 16's prohibition.

The ALJ did not squarely confront the problem whether and in what respect Capitol's refusal to pay was an "unjust or unfair device or means," as well, simply, as a knowing and wilfull attempt to evade otherwise applicable charges. He did, however, make a number of findings that indicate that Capitol's stubbornness went well

---

**12.** Capitol's defense based on an alleged failure to send notices of arrival is further weakened by the fact that it never sought a waiver of demurrage under a tariff provision reading as follows:

"No demurrage is applicable for delay caused by ocean carrier in receipt or delivery. Claims for waiver of demurrage in such instances shall be filed in writing, stating all facts upon which the claim is based, with the carrier's agent, Maritime Service Corporation, P.O. Box 1986, San Juan, Puerto Rico 00903. Such claims shall be allowed where carrier fault is established."

The ALJ found that Capitol never once filed any such objection, and that Capitol's initial pre-hearing request for arrival notices came five years after it first received an MSC bill for demurrage.

beyond an ordinary refusal to pay based on a legitimate doubt as to whether particular charges were due and owing. The ALJ found Capitol had misled MSC by first initiating a joint audit and then refusing to honor the conclusion of its own auditor, by engaging from the outset in a steadfast refusal to honor MSC billings, and by failing to pay "legitimate demurrage bills, or even any undisputed portions of those bills." It is clear from the ALJ's findings, which are well supported in the record, that he conceived Capitol's legal defenses to the demurrage charges to be both specious and in bad faith. With respect, for example, to Capitol's claim that it was not liable for demurrage on the household goods of military personnel, the ALJ stated,

> "In correspondence between MSC and Capitol about the demurrage bills, Capitol over a period of years did not claim that it was not responsible for the demurrage on movements of household goods. It is apparent that Capitol, in belatedly raising the issue, is merely continuing its policy of refusing to pay any demurrage, using whatever excuse or 'strawman' which came or comes to Capitol's mind."

When the case came before it, the Commission focused more directly than had its ALJ on the question whether Capitol's conduct constituted an "unjust or unfair device or means" within the meaning of Section 16. Ruling that it did, the Commission advanced as a first proposition that a refusal to pay need not be "clothed with the element of concealment, falsification, deception or fraud. . . ." The Commission interpreted the D.C. Circuit's decision in *Hohenberg Bros v. F. M. C.*, 114 U.S.App. D.C. 380, 384, 316 F.2d 381, 385 (1963), as having held that "a claim the plaintiff knew or should have known was false, can be considered similar in nature to 'false billings', 'false classifications', etc.," and that Section 16 is not limited to cases where the carrier is deceived or defrauded.

■ If by this the Commission meant to say that a carrier's mere stubborn but good faith refusal to pay a disputed rate or charge constitutes an "unjust or unfair de-

vice or means," we disagree. The language of Section 16, language which speaks in terms of both willful and knowing conduct and false billing, false classification, false weighing and other unjust or unfair mechanisms, cannot be read so broadly.

■ We accept, however, the Commission's second basis for finding a Section 16 violation, namely that the requisite element of fraud or concealment was established in this case by Capitol's "unexplained and apparently unjustified avoidance of any payment of the amounts found due and owing." As the Commission went on to hold,

> "Furthermore, while all Respondents assert in general terms that MSC's billing is inaccurate and deny that they owe the amounts found to be due, none has specifically identified any alleged errors or proven the inaccuracy of MSC's billings, even though the information regarding those charges is peculiarly within the knowledge of the Respondents. This indicates to the Commission that in order to avoid payment of owed demurrage charges due and owing, Respondents made claims they knew or should have known were false. We believe that this clearly is the type of knowing and wilful conduct proscribed by section 16.[7]"

"[7] 'Wilfully . . . means purposely or obstinately and is designed to describe the attitude of a carrier who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements.' *U. S. v. Illinois Cont. R. Co.*, 303 U.S. 239, 242 [, 58 S.Ct. 533, 82 L.Ed. 773] (1938) citing *St. Louis & S. F. R. Co. v. U. S.*, 160 [169] Fed. 69 (9th Cir. 1908)."

■ While in the quoted language the Commission was specifically addressing the requirement of knowledge and wilfullness, we think such language applies as well to the requirement that unjust or unfair means be shown. The Commission could properly find on this record that Capitol's refusal to pay had never been based upon a good faith legal defense, but simply reflected a calculated judgment to fight MSC to the end, forcing it to pay in blood, sweat and treasure for every penny eventually collected. On the merits of the demurrage claim, Capitol failed to present a legal de-

fense of any substance, and belatedly raised a variety of ever-changing contentions after the time for discovery or hearing was over. Those facts, coupled with earlier correspondence indicating an adamant and legally unexplained resistance to the notion of MSC's centralized demurrage billing procedure entitled the Commission to conclude that Capitol was not only knowing and wilfull in its refusal to pay, but that its policies, conducted as they were in bad faith, were tantamount to an unjust or unfair means of obtaining transportation by water at lower than applicable rates. Although it would not be proper to extend this rationale to cases involving refusal to pay based on honest differences, we think the conduct reflected in the present record was sufficiently egregious to support the Commission's finding that the requisite element of fraud or concealment was here established. Deference is owed to specific applications of broad statutory terms by the agency entrusted with the administration of the statute. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). A calculated effort in bad faith to avoid the payment of demurrage legitimately owing would, if successful, allow shippers and consignees to accomplish what Section 16 was intended to prevent—the receipt of carrier service at less than applicable rates and at less than rates charged to competitors. Thus while this case undoubtedly nears the outer limits of Section 16, we uphold the Commission's finding of violation.

### IV. *Section 18(a) of the Shipping Act*

 The ALJ and the Commission further found that Capitol's failure to pay applicable demurrage charges subjected the property of the shipping public to possible ocean carrier liens, and thus constituted a violation of Section 18(a) of the Shipping Act. That section provides in relevant part:

> "Every common carrier by water in interstate commerce shall establish, observe and enforce just and reasonable rates, fares, charges, classifications and tariffs, and just and reasonable regulations and practices relating thereto and to . . . all other matters relating to or connected with the receiving, handling, transporting, storing or delivering of property."

46 U.S.C. § 817(a).

Capitol does not contend that the subjecting of the public's property to carrier liens is insufficient to make out a Section 18 violation.[13] Nor does it deny that even independent of express provisions, a common carrier has a right of lien on goods received by it until all freight charges are paid. Indeed, Capitol admits that under the ocean carriers' tariffs in issue in the present case such liens survive even delivery of the goods.[14] It is contended instead that whatever liens might have existed were routinely waived by the carriers when they released containers to Capitol without providing notice of a continuing lien. Capitol submits "that as a matter of law a lien will survive after delivery of the goods only when that delivery is conditional and notice is given to the effect that delivery is made subject to the lien, and that the mere intention of the carrier to retain its lien, not communicated is insufficient." Capitol, however, cites no authority in support of

---

**13.** As Capitol does not contend that MSC was not the proper party to file a Section 22 complaint premised, in part, on an alleged statutory violation which subjected the property of the shipping public to possible carrier liens, we do not consider that question. *See Isthmian S.S. Co. v. United States*, 53 F.2d 251 (S.D.N.Y. 1931) (Per Curiam) (rejecting view that person qualified to file a complaint under Section 22 alleging any violation of the Shipping Act must be the one directly affected by the alleged violation).

**14.** Sea-Land's tariff provides:
> "The carrier shall have a lien on the goods, *which shall survive delivery*, for all freight, charges and other amounts due under this bill of lading and may enforce this lien by all available means, including public or private sale and without notice, upon the goods or any part thereof and any other property belonging to the shipper or consignee which may be in the carrier's possession." (Emphasis added.)

this position,[15] and introduces no evidence which would indicate that the carrier liens were waived. As noted, the relevant tariffs in effect in this case provide that such liens survive delivery of the goods. These tariffs are considered binding and in essence carry the force of law. *See Lowden v. Simmonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939). Capitol accepted the conditions imposed by the applicable tariffs; these tariffs did not provide for waiver of carrier liens and no such waiver has been shown. Capitol's argument is without merit.

## V. *Bias*

Capitol contends that it was deprived of its right to a fair hearing before the Commission in that the ALJ was biased and had prejudged the case. Capitol, however, never once raised the issue of bias before the ALJ. After the adverse decision of the ALJ was rendered, Capitol filed exceptions with the Commission. These exceptions likewise contained no allegation of bias on the part of the ALJ. The Commission subsequently entered an order upholding the ALJ's award of reparation against Capitol. Capitol filed a petition for reconsideration, and in this petition for the first time raised the bias issue.

Contentions of bias should be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist. *Marcus v. Director, Office of Workers' Compensation Programs*, 179 U.S.App.D.C. 89, 96, 548 F.2d 1044, 1051 (D.C.Cir.1976); *Bethlehem Steel Co. v. NLRB*, 74 App.D.C. 52, 120 F.2d 641 (D.C. Cir.1941). *See also* 46 C.F.R. § 502.149 (1978) (Commission Rules of Practice and Procedure); 5 U.S.C. § 556(b)(3) (APA). As one court noted, "It will not do for a claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor." *Marcus, supra*, 179 U.S.App. D.C. at 96, 548 F.2d at 1051. And while, as

Capitol notes, some decisions do indicate that a failure to object at the initial hearing may be explained by a reasonable fear that such an objection would further antagonize the trial examiner, *see, e. g., Cupples Co. Manufacturers v. NLRB*, 106 F.2d 100, 113 (8th Cir. 1939); *NLRB v. Washington Dehydrated Food Co.*, 118 F.2d 980 (9th Cir. 1941), those decisions in no way justify a party's failure to object in its exceptions to that examiner's initial decision. Thus, Capitol's allegation of bias is brought too late. And even were the issue of timeliness ignored, we conclude, after a review of the entire record, that Capitol received a fair hearing at the hands of the ALJ.

## VI. *Interest*

The Commission, in addition to ordering reparation, also awarded interest at the rate of eight percent. Capitol argues that the tariffs are silent on the issue of interest, that tariffs are contractual in nature, and that under Puerto Rico contract law interest shall only be ordered when it has been expressly stipulated. In the alternative, Capitol suggests that an award of interest at eight percent is excessive, as Puerto Rico law specifies that upon default of payment interest will be assessed at six percent. These arguments evidence Capitol's misunderstanding of the nature of the present action.

This reparation proceeding was brought by MSC pursuant to Section 22 of the Shipping Act, 46 U.S.C. § 821. *Cf. Maritime Service Corp. v. Sweet Brokerage De Puerto Rico*, 537 F.2d 560 (1st Cir. 1976) (action for demurrage brought under a tariff filed pursuant to the Shipping Act "arises under" that Act). It is well established that the award of interest by the Commission in a reparation proceeding is discretionary. *Flota Mercante Grancolombiana v. F. M. C.*, 126 U.S.App.D.C. 14, 20–21, 373 F.2d 674, 680–81 (D.C.Cir.1967); *United States Borax*

---

**15.** Capitol does cite *The Eddy*, 5 Wall. (U.S.) 481, 18 L.Ed. 486 (1866), but that case merely held that in general a lien is lost by unconditional delivery of the goods to the consignee. Capitol, in its brief, agrees that such liens may be preserved by special agreement of the parties. *See The Bird of Paradise*, 5 Wall. (U.S.) 545, 18 L.Ed. 662 (1867). In the present case, the ocean carrier tariffs provide such an agreement.

& *Chemical Corp. v. Pacific Coast European Conference*, 11 F.M.C. 451, 470 (1968). *See also Louisville & N. R.R. v. Sloss-Sheffield Steel & Iron Co.*, 269 U.S. 217, 239, 46 S.Ct. 73, 70 L.Ed. 242 (1925) (allowance of interest in ICC reparations proceeding is the uniform practice). The Commission's award of eight percent interest in the present case was well within its discretion and should not be disturbed.[16]

*Petition for Review is denied.*

---

**16.** Since argument, counsel have bombarded us with motions to correct and qualify certain assertions made at oral argument, a copy of Capitol's answer to the complaint in the dismissed district court proceedings, and copies of purported bills of lading. Most of these have no place in this review proceeding. Capitol has had nearly *seven years* in which to make arguments of this type to the tribunal properly engaged in factfinding, the Commission. Our review is of the agency record; we thus decline to consider these various submissions.